UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Aspect Software, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-10754-DJC |
| | ) | |
| Gary Barnett, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                May 27, 2011

**I. Introduction**

Plaintiff Aspect Software, Inc. has sued Gary Barnett ("Barnett"), its former Executive Vice President and Chief Technology Officer, alleging that Barnett breached his contract with Aspect Software when he accepted a position with a rival corporation. Aspect Software has moved for a preliminary injunction. For the reasons discussed below, Aspect Software's motion is GRANTED.

**II. Burden of Proof and Standard of Review**

In ruling on a preliminary injunction, courts must state the factual findings or conclusions that support the court's ruling. Fed. R. Civ. P. 52(a)(2). The burden of providing a factual basis sufficient to justify a preliminary injunction rests with the party seeking the injunction. Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). Unless the parties' competing versions of events are "in sharp dispute such that the 'propriety of injunctive relief hinges on determinations of credibility,'" Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc., 2010 WL 5485824 at *3 (D. Mass. Dec. 22, 2010) (quoting Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st

1

Cir. 1995)), the Court is free to accept as true "well-pleaded allegations [in the] complaint and uncontroverted affidavits." Id. at *1 n.2 (quoting Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976)).

## III. Factual Background

### A. Employment at Aspect

Aspect Software is a Delaware corporation formed in 2005 with its principal place of business in Massachusetts. Aspect Software develops, licenses and sells customer contact center products and services to customers around the world. Their products and services allow businesses to provide customer service, collections, sales and telemarketing directly to customers through contact centers. Aspect Software maintains substantial volumes of confidential information and trade secrets relating to its existing and potential customers and to the development of Aspect Software's product line.

Barnett was the President and CEO of a telecommunications company called Aspect Communications. In 2005, Barnett's company was acquired by Concerto Software and the two companies formed Aspect Software (hereinafter "Aspect"). On September 30, 2005, Aspect hired Barnett to be its Executive Vice President of Research and Development, Chief Technology Officer, and Executive Vice President of Global Support. Barnett served on Aspect's Executive Management team and was one of the company's four Executive Vice Presidents. Barnett's job responsibilities at Aspect were described at length in the record, see Affidavit of Aspect's Chief Executive Officer James Foy, D. 1-2, 44-45 at ¶ 17,[1] but to summarize, he was responsible for managing all aspects of the customer contact center business, including software and hardware development, technology standards, employee recruitment and retention, and customer relations, as

---

[1] References to docketed material are abbreviated as "D. __."

well as general strategic and business management with regard to the customer contact center business. His home base was an Aspect office in Tennessee, but he also had an office at Aspect's headquarters in Massachusetts.

Barnett signed an employment agreement ("Agreement") with Aspect that contained a provision entitled "Noncompete; Non-Solicitation" at section seven. The provision included the following language:

> (a) Employee acknowledges that Employee's services to the Company require the use of information including a formula, pattern, compilation, program, device, method, technique, or process that the Company has made reasonable efforts to keep confidential and that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use ("Trade Secrets"). Employee further acknowledges and agrees that the Company would be irreparably damaged if Employee were to provide similar services requiring the use of [the Company's] Trade Secrets to any person or entity competing with the Company or engaged in a similar business. Therefore, Employee agrees that during the Employment Period and during the twelve (12) month period immediately thereafter (the "Protection Period"), he or she will not, either directly or indirectly, for himself or herself or any other person or entity . . . (iv) Participate in any business in which he would be reasonably likely to employ, reveal, or otherwise utilize Trade Secrets used by the Company prior to the Executive's termination in any geographical area in which the Company or any of its affiliates conducts business. "Participate" includes any direct or indirect interest in any enterprise, whether as officer, director, employee . . . [or] executive . . . .

The Agreement also included the following provision, titled "Choice of Law," at section 17:

> All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the schedules hereto shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to any choice of law or conflict of law rules or provisions (whether of the Commonwealth of Massachusetts or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the Commonwealth of Massachusetts.

During the course of his employment, Barnett generated and was given access to information Aspect's complaint describes as trade secrets, including 1) strategic decisions concerning Aspect's

3

"roadmap" for future technological advancement, 2) the design of Aspect's flagship "Unified IP" product and the timeline for its release to the public, 3) details of the relationship between Aspect and the Microsoft corporation as to both technical and strategic matters, 4) the internal structure of Aspect products' components as well as the strengths and weaknesses of individual components, 5) negotiations between Aspect and Aspect's clients, 6) marketing strategies and specific customer targeting objectives, 7) Aspect products' ability to deploy across multiple servers, 8) the interfaces used to connect Aspect products to third-party products, 9) functionality, strengths and weaknesses of Aspect products, 10) cloud computing technology strategies, 11) Aspect's use of Microsoft's SQL server for reporting and analytics and plans for future use, 12) Aspect's use of other Microsoft software and platforms, and 13) Aspect's research and development budgets and resources, including the quality of Aspect's individual employees and Aspect's fiscal constraints.

### B. Employment at Avaya

Avaya is a global telecommunications company that, according to an affidavit submitted by Alan Baratz, Avaya's Senior Vice President and President, Global Communications Solutions, self-identifies as "the world leader in the contact center business." Avaya is one of Aspect's main competitors.[2] On April 17, 2011, Baratz offered Barnett the position of Avaya's Vice President and General Manager, Contact Center Business Unit. Baratz offered the position to Barnett because Baratz "consider[ed] Mr. Barnett to be a worldwide authority and luminary on contact center

---

[2]The nature of the competition between Aspect and Avaya is set out in detail in paragraphs 29-32 of the Foy Affidavit, and is discussed briefly in the affidavit of Alan Baratz, Avaya's Senior Vice President and President, Global Communications Solutions, D. 6-2, at ¶ 2. According to the affidavits, the competition is particularly intense with regard to customer contact center products.

technology and solutions."[3] The position included an annual base salary of $500,000 and annual target bonus of $350,000. On April 18, 2011, Barnett accepted the offer, informed Aspect that he was going to work for Avaya and resigned from Aspect.

Barnett and Avaya both claim that they took steps to protect Aspect's trade secrets before Barnett started his new job. Barnett turned off his Aspect-issued Blackberry immediately after tendering his resignation, left his laptop computer in his office, and boxed all Aspect property in his home and made arrangements for a representative from Aspect to retrieve the boxes. Avaya included language in its employment offer to Barnett that specifically forbade him from using any Aspect trade secrets in the course of his employment with Avaya and, separately, incorporated by reference Barnett's Agreement with Aspect.[4] Avaya and Barnett subsequently entered into an

---

[3]The parties dispute the exact work responsibilities that Barnett's new position at Avaya entails. Aspect asserts in its complaint that "Barnett's responsibilities in his new position with Avaya will likely be substantially similar to his responsibilities while employed at Aspect." Barnett asserts in his affidavit that his responsibilities at Avaya would not include 1) the use or protection of Avaya's trade secrets, 2) defining Avaya's standards for developing and acquiring technology, 3) enforcing technology standards on a company-wide basis, 4) monitoring staff and vendor performance, or 5) ensuring that Avaya's internal technological processes are legal. Barnett's affidavit does not affirmatively state what his job responsibilities at Avaya would include, but it is undisputed that Avaya is a competitor of Aspect's in the customer contact center business and that Barnett would be the executive in charge of that specific business at Avaya.

[4]The employment offer Avaya made to Barnett included the following language:

Proprietary Information: By acceptance of this offer, you agree that (1) no trade secret or proprietary information belonging to any of your previous employers will be disclosed or used by you at the Company, and that no such information, whether in the form of documents, memoranda, software, drawings, etc. will be retained by you or brought with you to Avaya other than those items explicitly permitted by your previous employers, and (2) you have brought to Avaya's attention and provided it with a copy of any agreement which may impact your future employment at Avaya including non-disclosure, non-competition, non-solicitation, invention assignment agreements or agreements containing future

5

"Employee Agreement Regarding Intellectual Property" that included similar protections. Additionally, on April 21, 2011, Alan Baratz, Avaya's Senior Vice President and President, Global Communication Solutions, sent Barnett an e-mail that provided, in relevant part:

> Given your current obligations to Aspect, I have put together the "ground rules" below, which I need you to follow:
>
> 1. Do not retain any documents or information relating to Aspect's business, in any form, that you obtained in your role as an Aspect employee.
>
> 2. Do not disclose any document or information relating to Aspect's business to anyone at Avaya and do not use such documents or information in your employment with Avaya.
>
> 3. If Aspect comes up in any discussion or meeting that you are attending in your role as an Avaya employee, you should not provide any input.
>
> 4. If, in the course of your employment with Avaya, you are asked for information relating to Aspect's business, you must refrain from providing the information.
>
> 5. Until April 19, 2012, do not have any communications with any Aspect employee about leaving his or her employment with Aspect.
>
> 6. Until April 19, 2012, do not play any role in hiring anyone who was employed with Aspect in the 180 days prior to your involvement in the hiring process.

---

work restrictions.

Existing Restrictive Covenants: You have provided Avaya with a copy of the Employment Agreement, dated September 30, 2005, as amended, between Aspect Software, Inc. ("Aspect Software") and you ("Aspect Employment Agreement")[] which contains certain restrictive covenants, which prohibit you from, among other things, soliciting either employees and/or customers or other business associates of Aspect Software to terminate or decrease their business relationship with Aspect Software, and prohibit you from participating in any business in which you would be reasonably likely to employ, reveal, or otherwise utilize Aspect's "Trade Secrets," as defined in the Aspect Employment Agreement. By signing this letter, you affirm that you can and will perform your duties as GM, Contact Centers without violating the Aspect Employment Agreement.

6

7. Until April 19, 2012, do not have any communications with any Aspect customer, supplier, licensee, licensor or business relation about doing business with Aspect or Avaya.

8. Until April 19, 2012, do not make any negative statements about Aspect to any Aspect customer, supplier, licensee, licensor or business relation.[5]

On April 21, 2011, after resigning from Aspect, Barnett relocated with his family to San Jose, California. On April 25, 2011, he started working in Avaya's Santa Clara, California office.

## IV. Procedural History

On April 27, 2011, Aspect filed the instant lawsuit in Suffolk Superior Court against Barnett alleging breach of contract and seeking injunctive relief and declaratory judgment. On May 3, 2011, Barnett removed the action to this Court. On May 9, 2011, Aspect submitted to this Court a draft injunctive order that would enjoin Barnett from working for Avaya for a period of one year (consistent with the "Protection Period" discussed in §§ 7(a) and (d) of the Agreement), from contacting Aspect's customers or potential customers for the same period of time, and from disclosing or using any of Aspect's trade secret information. On May 11, 2011, the Court permitted Avaya to participate in the case as an *amicus curiae*. That same day, the Court held a hearing on Aspect's motion for a preliminary injunction at which counsel for Aspect, Barnett and Avaya all appeared.

## V. Discussion

### A. Preliminary Injunction

To obtain a preliminary injunction, Aspect "bear[s] the burden of demonstrating (1) a

---

[5]Additionally, Barnett submitted an affidavit to this Court, D. 6-1, stating that he has offered to take additional steps to protect Aspect's trade secrets, including "provid[ing] Aspect a periodic declaration - at the end of each month through April 2012 - certifying under oath my non-use and non-disclosure of any non-public Aspect information."

7

substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." Nieves-Marquez, 353 F.3d at 120 (1st Cir. 2003). "The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

### 1. Likelihood of Success on the Merits

#### a. Choice-of-Law

Aspect and Barnett dispute whether Massachusetts law or California law should govern the analysis of the merits of Aspect's complaint. In a diversity action, the choice-of-law rules that apply are those of the forum state, in this case, Massachusetts. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). As a general rule, Massachusetts courts will give effect to a choice-of-law clause included in the contract itself. See, e.g., Morris v. Watsco, Inc., 385 Mass. 672, 674 (1982) ("Massachusetts law has recognized, within reason, the right of the parties to a transaction to select the law governing their relationship"). However, "Massachusetts courts will not honor the parties' choice-of-law if the application of that provision: '[1] would be contrary to a fundamental policy of a state; which has [2] a materially greater interest than the chosen state in the determination of the particular issue; and which . . . [3] would be the state of the applicable law in the absence of an effective choice of law by the parties.'" Roll Sys., Inc. v. Shupe, 1998 WL 1785455, at *2 (D. Mass. Jan. 22, 1998) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAW § 187(2)(b) (1971)).

Here, the Agreement includes a specific choice-of-law provision identifying the laws of the Commonwealth of Massachusetts as the relevant substantive law governing the Agreement. Barnett

8

argues that this Court should not honor the choice-of-law provision because doing so would be contrary to what he characterizes as a fundamental policy of California, namely section 16600 of the California Business and Professional Code, which states that "[e]very contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Barnett's argument fails to satisfy any of the three prongs which must be met before this Court may disregard a contractual choice-of-law clause.

First, while California's policy against non-competition covenants has been characterized as "fundamental," Roll Sys., 1998 WL 178455, at *2, that fundamental policy does not extend to contractual clauses that are designed to protect an employer's trade secrets. See Shipley Co., LLC v. Kozlowski, 926 F. Supp. 28, 30 (D. Mass. 1996) (citing to Muggill v. Reuben H. Donnelly Corp., 62 Cal. 2d 239, 242 (1965) (Section 16600 "invalidates provisions in employment contracts prohibiting an employee from working for a competitor . . . unless the[ provisions] are necessary to protect the employer's trade secrets"); see also Roll Sys., 1998 WL 1785455, at *2 n.1 (discussing Shipley and the trade secret exception in California policy).[6] Here, the Agreement's non-compete

---

[6] More recently, some California courts have questioned the vitality of the Muggill line of cases defining the trade secrets exception to Section 16000. See Edwards v. Arthur Andersen LLP, 44 Cal. 4th 937, 946 n.4 (Cal. 2008) ("[T]his court generally condemns non-competition agreements . . . . [but w]e do not here address the applicability of the so-called trade secret exception to section 16600"); Dowell v. Biosense Webster, Inc., 179 Cal. App. 4th 564, 577 (Cal. Ct. App. 2d Dist., 2009) ("Although we doubt the continued viability of the common law trade secret exception to covenants not to compete, we need not resolve the issue here"); Retirement Group v. Galante, 176 Cal. App. 4th 1226, 1233-39 (Cal. Ct. App. 4th Dist., 2009) (holding that no trade secrets exception exists to Section 16600, and that abuse of trade secrets must be redressed in tort rather than in contract). None of these courts have gone so far as to assert that Section 16600 admits no distinction between non-compete agreements tailored to protect trade secrets and broader non-compete agreements, or that any emergent prohibition on the former is as fundamental to California's policy as California's longstanding prohibition on the latter.

9

clause is clearly designed to protect Aspect's trade secrets. It rests on two separate acknowledgments by Barnett of the threat his competition could pose to the security of Aspect's trade secrets. The restrictions it places on Barnett's future employment are limited to employment that would threaten Aspect's trade secrets, and, conversely, it does not prohibit Barnett from working for Aspect's competitors as long as any such work does not involve a reasonable likelihood that Barnett would misuse Aspect's trade secrets. The non-compete clause here is tailored in such as way as to avoid implicating California's fundamental policy against broad non-competition agreements.

Second, California's interest in the determination of the particular issue at bar is either weaker than or, at best, equal to Massachusetts' interest. The non-compete clause was negotiated between a company with its principal place of business in Massachusetts and its employee, who worked at least in part in Massachusetts; any harm caused by a violation of the non-compete clause will be felt in Massachusetts. Even if the Court chose to credit in full the position, put forward in Avaya's *amicus* brief, that California has an interest in the freedom of its residents to seek employment regardless of trade-secret-related non-compete clauses and has a separate and distinct interest in the freedom of its employers to hire an employee regardless of any trade-secret-related covenants not to compete that employee may have entered into in other states, California's twin interests in pursuing its non-fundamental policy would not materially outweigh Massachusetts' interest in ensuring that Massachusetts contracts are enforced.

Third and finally, California would not be the state of the applicable law in the absence of an effective choice-of-law by the parties. In cases where no choice-of-law provision applies, the Supreme Judicial Court has decided "not to tie Massachusetts conflicts law to any specific doctrine,

but seek[s] instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole," and looks to the Restatement (Second) of Conflict of Laws (1971) as an "obvious source of guidance." Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631-32 (1985). The Restatement sets forth seven factors relevant to the choice of the applicable rule of law in absence of a contractual choice-of-law clause or statutory guidance from the forum state. One of those factors is "the protection of [the parties'] justified expectations" when entering into the contract. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(d) (1971). Here, the Agreement was entered into by a Tennessee resident beginning work at a Massachusetts firm, with his work duties largely split between Massachusetts and Tennessee. Even absent the explicit Massachusetts choice-of-law clause in the Agreement, there is no basis for finding an expectation, justified or otherwise, that the Agreement would be governed by California law rather than the laws of Massachusetts or even Tennessee. Without engaging in a step-by-step analysis of the remaining six factors,[7] this Court simply notes that, even considering the fact that Barnett is now a California resident and is working at his new employer's place of business in California, a holistic examination of the factors set forth in the Restatement does not suggest that the appropriate substantive law here in the absence of any choice-of-law by the parties would be the law of California rather than Massachusetts.

Accordingly, the Court will enforce the choice-of-law clause agreed to by the parties and will

---

[7] The seven factors set forth in the Restatement are: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (1971).

interpret the Agreement pursuant to the substantive law of Massachusetts.

### b.  Underlying Breach of Contract Claim

Aspect's underlying complaint rests on a breach of contract claim, coupled with requests for injunctive and declaratory relief that are derivative of the breach of contract claim.  Under Massachusetts law, to prove a breach of contract claim, a plaintiff must show:  1) existence of a valid and binding contract, 2) that the defendant breached the terms of the contract, and 3) the plaintiff has suffered damages from the breach.  Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995) (applying Massachusetts law).  At issue here is the Agreement's non-compete clause. "Non-[c]ompetition [a]greements are enforceable only if they are 'necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest.'" Lombard Med. Tech., Inc. v. Johannessen, 729 F. Supp. 2d 432, 438 (D. Mass. 2010) (quoting Boulanger v. Dunkin' Donuts, Inc., 442 Mass. 635, 639 (2004)).  "Courts will not enforce non-competition agreements meant solely to protect employers from run-of-the-mill business competition[, b]ut the protection of trade secrets, other confidential information, and the good will the employer has acquired through dealings with his customers constitute legitimate business interests."  Id. at 439 (citations and quotation marks removed).  Barnett does not challenge the necessity of the covenant, the reasonableness of its scope or that the provision is in the public interest.[8]  Moreover, the Court notes that courts have upheld non-compete terms significantly longer than one year, see, e.g., Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 331 (1975) (finding three-year restriction to be reasonable); Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 289-

---

[8]Indeed, it would be difficult to do so now, since in section 7(b) of the Agreement Barnett acknowledged and agreed to the necessity and reasonableness of the "duration, geographical area and scope" of the non-compete provision.

12

90 (finding that non-compete lasting less than three years was not excessive); All Stainless, Inc. v. Colby, 364 Mass. 773, 779 (1974) (finding two-year restriction to be reasonable), and Barnett acknowledges that the covenant is not as broad in scope as to amount to an "outright ban" of work for a competitor. Def.'s Memo. at 13. The provision also explicitly was drafted to protect Aspect's trade secrets, which is a goal consistent with the public interest. Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 166 n.8 (1979).

Here, the Agreement prohibits Barnett from "participat[ing] in any business in which he would be reasonably likely to employ, reveal or otherwise utilize trade secrets." Instead of quarreling with the scope and breadth of the non-compete clause, Barnett argues that the phrase "reasonably likely" is either vague and therefore unenforceable or ambiguous and therefore requiring the Court to resort to extrinsic evidence to determine the phrase's meaning. Barnett argues in the alternative that his employment with Avaya does not breach the Agreement's prohibition.

"In order to create an enforceable contract, '[i]t is a necessary requirement that [the] agreement . . . be sufficiently definite to enable the courts to give it an exact meaning.'" Armstrong v. Rohm & Haas Co., Inc., 349 F.Supp.2d 71, 78 (D. Mass. 2004) (quoting WILLISTON ON CONTRACTS § 4:18 (4th ed. 1990); Hasting Assocs., Inc. v. Local 369 Bldg. Fund, Inc., 42 Mass. App. Ct. 162, 165 (1997) (noting that "a contract is not held to be unenforceable 'if, when applied to the transaction and construed in light of the attending circumstances, the meaning can be ascertained with reasonable certainty'"). "Whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court." Armstrong, 349 F.Supp.2d at 78. Similarly, "[w]hether a contract is ambiguous is a question of law. But a contract is not ambiguous merely because a party to it, often with a rearward glance colored by self-interest, disputes an interpretation

13

that is logically compelled." Muskat v. U.S., 554 F.3d 183, 190 (1st Cir. 2009) (citations and quotation marks removed). "Rather, a contract is ambiguous only if the language is susceptible to more than one meaning and reasonable persons could differ as to which meaning was intended." Id. (citations and quotation marks removed). At this preliminary stage of the litigation, the Court finds little support for Barnett's position that the phrase "reasonably likely" as used in the Agreement is vague or ambiguous. Courts and the parties have no trouble understanding and applying the concept of reasonable likelihood. Indeed, here, the analysis of the phrase arises in the context of this Court's determination of whether Aspect has a "reasonable likelihood of success on the merits" of its claim. Jean v. Mass. State Police, 492 F.3d 24, 25 (1st Cir. 2007). Barnett has not cited to any authority suggesting that the phrase "reasonably likely" is vague or ambiguous *per se* when used in a contract, and the Court declines to reach such a novel holding at this stage of the litigation.[9] Thus, for the limited purpose of its preliminary injunction analysis, the Court finds a likelihood that Aspect will prevail with regard to its assertion that the Agreement is neither vague or ambiguous.

The Court also finds that Aspect has carried its burden of showing that it is reasonably likely to prevail with regard to its assertion that Barnett breached the Agreement by accepting a position as Avaya's Vice President and General Manager, Contact Center Business Unit. As the Foy and Baratz declarations make clear, Aspect and Avaya are intense competitors in the customer contact

---

[9] Perhaps as a way of explaining the dearth of authority supporting his position on this point, Barnett asserts that the phrase "reasonably likely" is "unusual" language for a restrictive covenant, Def. Memo at 1, 13, and implies that unusual language is more likely to be vague and ambiguous. The Court disagrees with this implication. If the phrase at issue in the Agreement is indeed unusual drafting–and the Court takes no position as to whether this is so–that may, contrary to the defendant's argument, alternatively suggest that the Agreement was unusually well drafted.

14

center business, precisely the field in which Barnett has encyclopedic knowledge of Aspect's trade secrets. Avaya hired Barnett to work in that same field. Whether or not Barnett actually has "employ[ed], reveal[ed] or otherwise utilize[d]" Aspect's trade secrets in the course of his work with Avaya (or whether he will do so in the future), Aspect has established that at the time of his departure from Aspect it was at the very least "reasonably likely" that he would do so. That likelihood is sufficient to establish a breach of the Agreement.

The Court appreciates Barnett and Avaya's efforts to protect the integrity of Aspect's trade secrets. But even if these scrupulous efforts are wholly successful, they will merely reduce the harm that will flow from Barnett's breach of the Agreement; they will not erase the fact of the breach. Further, some of these efforts, such as those set forth in Baratz's e-mail to Barnett, lack the force of law; others, such as the trade secret protections written into Barnett's employment agreement, are backed by the force of contract law as to the bilateral relationship between Avaya and Barnett but cannot be enforced by Aspect.[10] These efforts, while admirable, do not alter the analysis that Aspect is likely to succeed on its claim that Barnett breached the Agreement.

2. Irreparable Harm

The likelihood of irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief. Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004). As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding

---

[10]Barnett makes much of the fact that, as he claims, Aspect has allowed other employees to leave and join competitors and has not filed suit to prevent them from doing so. (D. 6 at 4-5; Barnett Aff. ¶¶42-45). Even accepting such allegations as true, it is not relevant to whether Aspect is likely to succeed on the merits in its case against Barnett. See Boulanger, 442 Mass. at 643 (noting that "the fact that the defendant does not require all employees to sign a covenant not to compete is not relevant because the defendant may reasonably decide which persons pose the greatest risk of using its confidential information competitively, . . .").

of irreparable harm. Lombard Med. Tech., 729 F. Supp. 2d. at 442 (D. Mass. 2010). Under that general rule, Aspect's successful showing that it is likely to prevail on claim that Barnett violated the Agreement's non-compete clause designed to protect trade secrets would be sufficient to establish a significant risk of irreparable harm.

Barnett argues that he and Avaya have already taken sufficient steps to protect Aspect's trade secrets, removing the threat of irreparable harm and, accordingly, any need for preliminary injunctive relief. He points to the April 21, 2011 e-mail between Baratz and Barnett, the "Proprietary Information" and "Existing Restrictive Covenants" clauses in Avaya's employment offer to Barnett, and clause "F" of Barnett's Avaya Employment Agreement Regarding Intellectual Property. He has also offered to provide monthly confirmation to Aspect that he has neither used nor disclosed any non-public Aspect information.

The Court fully credits the sincerity of Barnett and Avaya's intent and the scrupulousness of their efforts. But given the extent of Barnett's experience at Aspect and the similarity between his positions at Aspect and at Avaya, "it is difficult to conceive how all of the information stored in [Barnett]'s memory can be set aside as he applies himself to a competitor's business and its products." Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995). "On the contrary, what [Barnett] knows about [Aspect] is bound to influence what he does for [Avaya], and to the extent it does, [Aspect] will be disadvantaged." Id. Other courts in this district, faced with similar circumstances, have concluded that even sincere, scrupulous efforts by an employee and his or her new employer to protect a prior employer's trade secrets are insufficient to remove the threat of irreparable harm via disclosure of trade secrets. See id. at 297-98; see also Lombard Med. Tech., 729 F. Supp. 2d. at 442 (finding threat of irreparable harm from inevitable disclosure even where

16

defendant "fully intended to protect [plaintiff's] confidential information"); C.R. Bard, Inc. v. Intoccia, 1994 WL 601944, at *3 (D. Mass. 1994) (holding former employee "could not and did not leave behind his special knowledge of plaintiff's operation, and in serving his new employer he will inevitably draw upon that knowledge").[11] Accordingly, even taking into account Barnett and Avaya's commendable efforts to protect the integrity of Aspect's trade secrets, Aspect has carried its burden of establishing a significant risk of irreparable harm absent preliminary injunctive relief.

### 3. Balance of Hardships

"Any potential harm caused to [Aspect] by a denial of its motion must be balanced against any reciprocal harm caused to [Barnett and Avaya] by the imposition of an injunction." TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 32 (D. Mass. 2004). "Non-competition agreements by their nature impose some burden on former employees. That fact alone does not make such covenants unenforceable." Lomabrd Med. Tech., 729 F.Supp.2d at 442 (citation and quotation marks removed). Here, Barnett acknowledged in clause 7(b) of his Agreement with Aspect that the Agreement's non-compete restrictions "do not impose an undue hardship on him . . . due to the fact that he . . . has general business skills which may be used in industries other than those in which [Aspect] and its affiliates conduct their business and do not deprive [Barnett] of his livelihood." Even setting this acknowledgment to one side, and taking seriously the disruption a preliminary injunction temporarily precluding Barnett from working for Avaya would cause to Barnett, his family, and (to a lesser extent) Avaya, the Court nonetheless finds that the harm a

---

[11]Barnett argues that "[t]he heyday of so-called 'inevitable disclosure' [jurisprudence] was in the mid-1990s to the early 2000s, and the tide has since turned," and points to recent cases from sixteen different states. Def.'s Memo. at 6, 6 n.5. Whether or not Barnett's position is correct as a general matter, it does not describe the current state of Massachusetts law. The Court finds Lombard Med. Tech., Marcum, and C.R. Bard more persuasive authority as to Massachusetts law than the out-of-district cases interpreting out-of-state law cited by Barnett.

preliminary injunction would cause to Barnett is outweighed by the significant risk of irreparable harm to Aspect absent an injunction.

### 4. Public Interest

A preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Marquez, 353 F.3d at 120. Massachusetts has a clear public policy in favor of strong protections for trade secrets. See Jet Spray Cooler, 377 Mass. at 166 n.8. The parties have not disputed Massachusetts' policy on this point and the Court finds no friction between the public interest and the issuance of a preliminary injunction in this case.

## VI. Conclusion

For the reasons discussed above, Plaintiff Aspect's Motion for Preliminary Injunction is GRANTED. Accordingly, it is hereby ordered that Defendant Gary Barnett shall be enjoined and restrained until further order of the Court from:

> (1) Continuing his present employment with Avaya, Inc., its subsidiaries or affiliates for the duration of the "Protection Period" as defined by Section 7(a) of the Agreement;
>
> (2) Violating Section 7(a) of the Agreement. Accordingly, Barnett is prohibited from directly or indirectly, for himself or any other person or entity,
>
>> (i) inducing or attempting to induce any employee of Aspect or any of Aspect's affiliates to leave Aspect or such affiliate, or in any way interfering with the relationship between Aspect or any affiliate and any employee thereof;
>>
>> (ii) hiring any person who is (or in the case of a former employee, was an employee of Aspect or any affiliate at any time during the 180 day period prior to any attempted hiring by Barnett) an employee of Aspect or any affiliate;
>>
>> (iii) inducing or attempting to induce any customer, supplier, licensee, licensor or other business relation of Aspect or any affiliate to cease doing business with Aspect or such affiliate, or in any way interfere with the

18

relationship between any such customer, supplier, licensee, licensor or business relation and Aspect or any affiliate (including, without limitation, making any negative statements or communications about Aspect or its affiliates);

(iv) participating in any business in which he would be reasonably likely to employ, reveal, or otherwise utilize Trade Secrets used by Aspect prior to Barnett's termination; and

(3) Disclosing or using Aspect's confidential information, proprietary information, or Trade Secrets (as that term is defined in the Agreement).

For the issuance of this injunctive relief, the plaintiff is required to post a bond pursuant to Fed. R. Civ. P. 65. In the exercise of its discretion, the Court imposes a bond of $500,000. The order of preliminary injunction will become effective upon the filing of the $500,000 bond by Aspect and its notice to Barnett of such filing. Because the parties have not yet stated their positions as to the appropriate amount of bond, the Court allows each party leave to file a motion to modify the bond amount within seven days. Once the order of preliminary injunction becomes effective, it will remain in effect while the Court considers any motion to modify the bond amount.

**So ordered.**

/s/ Denise J. Casper

United States District Judge