UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ASPECT SOFTWARE, INC., <br><br>    Plaintiff, <br><br>v. <br><br>GARY E. BARNETT <br><br>    Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. 1:11CV10754-DJC |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO ALTER AND/OR AMEND THE MAY 27 ORDER**

Plaintiff, Aspect Software, Inc. ("Aspect"), submits this Memorandum in response to the Defendant, Gary E. Barnett's ("Barnett") Motion to Alter and/or Amend the May 27 Order ("Motion to Amend"). Notwithstanding the fact that Barnett has failed to assert (i) that he was harmed in any way by the Court's Order of May 27, 2011 (the "Order") or (ii) that he runs any risk of suffering any harm, let alone irreparable harm, if he were forced to abide by the letter of the Order, Barnett persists in his efforts at modification. Nevertheless, and in light of Barnett's shortcomings, Aspect assents to certain modifications, so long as additional restrictions also are put in place to protect its legitimate business interests which this Court has already decided are deserving of protection. Specifically, Aspect proposes that the Court enter an order in the form attached hereto as Exhibit A.

**INTRODUCTION**

This matter arises from Barnett's violation of a restrictive covenant when he accepted a position with Aspect's chief competitor, Avaya, Inc. ("Avaya") mere days after his unexpected

1

and sudden resignation from Aspect. Prior to this Court entering the Order, Barnett was working for Avaya in the capacity of Vice President and General Manager, Contact Center Business Unit. Since entry of the Order, Barnett has continued his employment with Avaya, under color of different title, and on information and belief, has continued at all times to receive full compensation and benefits pursuant to his new employment agreement. Indeed, Barnett does not assert any harm, irreparable or otherwise, beyond the loss of "piece of mind," such loss attributable entirely to his own actions. Nevertheless, Barnett seeks to amend the preliminary injunction and have this Court stamp its seal of approval on his unilateral decision to work in particular capacities which Barnett argues, in self serving fashion, will not violate the Order.

## PROCEDURAL HISTORY

The Order at issue enjoined and restrained Barnett from, among other things, "participating in any business in which he would be reasonably likely to employ, reveal, or otherwise utilize Trade Secrets used by Aspect prior to Barnett's termination." On May 31, 2011 and in furtherance of the Order, Aspect posted a $500,000 bond bringing the terms of the Order into effect. On June 21, 2011, Barnett filed the subject Motion to Amend. This filing occurred three weeks after issuance of the preliminary injunction, during which time Barnett continued to work █████████████ for Avaya despite the Order. Aspect was, and remains, concerned about the general vagueness and lack of specificity of the job descriptions provided by Barnett's memorandum in support of the Motion to Amend.

On July 20, 2011 Barnett made a Supplemental Filing regarding the actual duties he was to perform at Avaya and specifies particular Avaya products towards which his work will be tailored (Docket No. 41). This Supplemental Filing purports to clarify the uncertainty in his original supporting memorandum; however, the supplement is equally uninformative as it listed

2

numerous new activities Barnett was "likely" to perform, rendering it "less likely," but not certain, that he would refrain from other duties set forth in his initial memorandum. Aspect shared its concerns with the Court at the telephonic conference of July 21, 2011, and this Court ordered that Barnett provide Aspect with a clear, concise description of his anticipated activities so that Aspect could respond intelligently to the Motion to Amend. On July 24, 2011, counsel for Barnett transmitted to Aspect's counsel an email which set forth more specifically what Barnett sought to do for Avaya in the event the Motion to Amend was allowed (See Exhibit B). Specifically, counsel for Barnett stated in the email: ███████████████████ ███████████████████████████████████████████ ████████████ For purposes of the Motion to Amend, Aspect reasonably assumes that the July 24, 2011 email from Barnett's counsel is the controlling document with respect to the duties Barnett seeks to perform. Aspect will therefore respond to the Motion to Amend on this basis.

## ASPECT'S POSITION

Aspect has reviewed Barnett's proposed modification with great care in light of Exhibit B and has determined that with respect to at least one product identified in Barnett's Supplemental Filing, the defined "proposed job roles" would render Barnett reasonably likely to utilize and/or disclose Aspect's proprietary information, confidential information and trade secrets in violation of the Order. Aspect objects to any role Barnett seeks to perform relating to this particular product. As to the remaining seven products to which Barnett will limit his defined job roles, Aspect does not object to a modification of the Order as long as some reasonable and appropriate safeguards also are put in place. Given Barnett's ████████████████, Aspect remains wary that without such safeguards it remains reasonably likely that Barnett will utilize or disclose Aspect's trade secrets, inadvertently or otherwise. It should be noted that in previous filings with

3

this Court Barnett has essentially offered to adopt, either explicitly or in spirit, many of Aspect's proposed safeguards.

## ARGUMENT

### I. Legal Standard for Amending Preliminary Injunction

This Court has already determined that (i) Aspect maintains a reasonable likelihood of success on its underlying breach of contract claim; (ii) Barnett's employment with Avaya presents a credible risk of irreparable harm to Aspect; (iii) balancing the prospective harms to both parties weighs in favor of Aspect; and (iv) public policy is served by enforcing Massachusetts' strong interest in preserving trade secrets.

It is true that this Court has discretion to amend its own preliminary injunction. However, what Barnett fails to address in his papers is the proper standard by which this Court must assess the propriety of exercising its discretion. In the First Circuit, modification of a preliminary injunction is appropriate when "'it is no longer equitable that the judgment should have prospective application' and there is a 'significant ... change in operative fact.'" S. New Eng. Tel. Co. v. Global NAPs, Inc., 620 F. Supp. 2d 152, 154 (D. Mass 2009) quoting Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo, 551 F.3d 10, 16 (1st Cir. 2008). "A preliminary injunction may be modified because of changes in circumstances occurring since its entry that indicate that the original order has proved faulty in accomplishing its intended results." FTC v. Direct Mktg. Concepts, Inc., 2006 U.S. Dist. LEXIS 1946, *13 (D. Mass. 2006) citing United States v. United Shoe Mach. Corp., 391 U.S. 244, 249 (1968); Williams v. Lesiak, 822 F.2d 1223, 1227 (1st Cir. 1987); see also 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2961.

Of particular significance in this case, to establish the necessary "change in circumstances" justifying modification, the change must be such that "the injunction now imposes an undue hardship on the affected party." Flag Fables, Inc. v. Jean Ann's Country Flags & Crafts, Inc., 730 F. Supp. at 1178; Pan American Computer Corp. v. Data General Corp., 652 F.2d 215, 217 (1st Cir. 1981). Here, the only change in Barnett's circumstances since entry of the Order is his official title with Avaya and the explicit job descriptions he purports to perform. At all times Barnett has continued to be employed by and receive full compensation and benefits from Avaya. In this sense, there has been no material adverse consequence to Barnett as a result of the Order. To the extent Barnett references his fear or uncertainty about potential future litigation for violating the Order, Barnett brought this situation upon himself. By failing to make his intentions clear to Aspect and this Court before making the unilateral decision to continue his employment at Avaya, in spite of a binding Court Order, Barnett's "uncertainty" is entirely of his own making.

In truth, the only change at all to Barnett's circumstances is the scope of his employment with Avaya, for which he continues to receive his full compensation. Therefore, Barnett must somehow link this change to some undue hardship that would befall him absent the requested modification. Under the circumstances, Barnett simply cannot make such a showing; in fact, he does not even attempt to identify any meaningful hardship he has or will suffer.

Even more importantly, Barnett makes no attempt to explain why working on the particular Avaya products identified precludes the possibility of utilizing or disclosing Aspect trade secrets. Rather, he merely assumes (incorrectly) that if Aspect and Avaya do not directly compete on a particular product, he is unlikely to disclose trade secrets. While the existence of competition in a particular product line, without more, is a factor to consider as to whether

Barnett is likely to utilize or disclose Aspect's trade secrets, it is not the only consideration. For example, and as will be discussed more fully below, functionality and technology may be easily applied to different applications resulting in benefit to Avaya at the direct expense of Aspect. In this sense, Barnett has failed to make even the most cursory showing that legally entitles him to the relief he seeks.

Despite Barnett's failure to meet his burden, and in the spirit of good faith cooperation, Aspect is willing to permit his continued work on seven of the eight products identified in his Supplemental Filing, so long as appropriate safeguards are implemented. However, Aspect vehemently objects to any work performed by Barnett with respect to the one product which is in direct competition with Aspect.

II. **Barnett Should be Precluded from Any Work Relating to Avaya's Agile Communications Environment Products, Bullet Point No. 7 in Barnett's Supplemental Filing, as Any Such Work Would Compete Directly with Aspect**

Barnett proposes in his Supplemental Filing that he be permitted to work on Avaya's Agile Communication Environment products ("ACE"). Aspect objects to this proposal as the ACE product is primarily used for purposes directly related to contact center applications, placing it in direct competition with Aspect products. (See Exhibit C, Affidavit of Serge Hyppolite, ¶ 6). The proximity of similar Avaya and Aspect products in the marketplace and the similarity between the products themselves, in conjunction with Barnett's instrumental role in developing Aspect's version of this product, renders him reasonably likely to utilize, disclose or reveal Aspect's confidential information, proprietary information or trade secrets in violation of the Court Order for Preliminary Injunction.

The main purpose for ACE is as a Computer Telephony Integration link ("CTI") or web service middleware to extend the contact center application into a company's front office

applications such as a CRM (Customer Relationship Management) product or to connect to other UC (Unified Communication) platforms like Microsoft Lync and IBM Sametime. Id. at ¶ 5. For example, this technology is used to tie telephony functions into a CRM product, such as Microsoft Dynamics, Oracle's Siebel CRM or Salesforce.com, to "screen pop" the appropriate screen in the CRM application based on the phone number that was received on the telephony platform. Id. at ¶ 6. As demonstrated by the Avaya brochure attached to Exhibit C, a significant number of the uses for ACE are directly related to contact centers – Aspect's primary market. The first page of that Avaya brochure states that "[f]or example, ACE integrates and extends Avaya Contact Center providing a cost effective way to directly integrate customer contact into any business application or process."

Under Barnett's supervision, Aspect recently created a new CTI link of its own for use in its flagship product, Unified IP version 7.0. Id. at ¶ 8. This new CTI link was developed based upon the design of the Event Bridge CTI link for Aspect Call Center ACD, of which Barnett has significant knowledge of Aspect's confidential information, proprietary information and trade secrets. Id. Moreover, Barnett's history with Aspect and its predecessor companies demonstrate Barnett's intimate familiarity with Aspect's confidential information, proprietary information and trade secrets relating to this particular product. Indeed, in his own affidavit submitted in opposition to Aspect's original Motion for a Preliminary Injunction, Barnett states that he founded and was employed by Prospect Software, Inc. which pioneered CTI. See Affidavit of Gary E. Barnett in Opposition to Plaintiff's Motion for a Preliminary Injunction, ¶ 6. Barnett acquired this and other confidential and proprietary information of Prospect Software which became the property of Aspect. As set forth in his performance evaluation, Barnett has significant expertise and knowledge of Aspect's CTI technology and trade secrets. See Exhibit

7

D, Affidavit of Dawn Allen. There is no doubt that Avaya's ACE product not only competes in the same contact center market where Aspect conducts most of its business, but it also competes directly with an Aspect product for which Barnett oversaw the design and development. Under these circumstances, it is reasonably likely that Barnett will utilize, reveal or disclose Aspect's confidential information, proprietary information and trade secrets if permitted to ▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬ of ACE. Therefore, Barnett must be uniformly precluded from performing any work for Avaya relating to the ACE product.

### III. Aspect does not Object to Barnett Working with the Remaining Seven Products in the Supplemental Filing So Long As the Court Implements Appropriate Safeguards Attendant to any Modification of the Order

Barnett has been vested with sensitive, proprietary and confidential information which renders him reasonably likely to utilize or disclose Aspect's trade secrets in the course of performing ▬▬▬▬▬▬ duties with respect to the remaining seven products identified in his Supplemental Filing. Irrespective of direct competition with an Aspect product, as a ▬▬▬▬▬▬ Barnett surely will be placed in situations where his knowledge and experience with Aspect, its products, marketing strategy, cost points, customer base, etc., will impact his decision making processes in the course of conducting business on behalf of Avaya.

By way of example, and not limitation, for any Avaya product on which Barnett ▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬ there is substantial risk that he will utilize Aspect trade secrets. For years, Barnett was deeply involved in the development of Aspect's product life cycle, which included proprietary means of investigation, proposal, and marketing of all new Aspect products. ▬▬▬▬▬▬▬▬▬▬ Barnett may, intentionally or not, rely on what he knows of Aspect's methods and compromise Aspect's unique approach to product development. Additionally, any role performed by Barnett with respect to ▬▬▬▬▬

███ creates a substantial risk of relying on Aspect's trade secrets. Any ███ considered by Avaya in connection with contact center, performance management, workforce optimization or Unified Communication products or services will undoubtedly require that Barnett leverage his knowledge of Aspect's practices, strengths, weaknesses, and other trade secrets, as Aspect does business in each of those markets. Having Aspect as a reference point for such ███ provides a clear and unequivocal competitive advantage to Avaya, as does Barnett's knowledge concerning Aspect's proprietary and confidential ███ ███ Moreover, Barnett's role in improving Avaya's ███ could potentially compromise Aspect trade secrets as Barnett has knowledge of how the Aspect ███ model works and has observed numerous improvements to the system adopted during his terms as Aspect's Executive Vice President of Global Support from 2005 to 2010. To draw from Aspect's model to improve Avaya's ███ would be extremely valuable to Avaya and diminish a distinct competitive advantage of Aspect.

If Barnett is permitted to help Avaya execute its ███ deals, customers that Barnett will be targeting in his role at Avaya would commonly have multi-vendor environments. As such, many of these customers may also be customers of Aspect. It is most often the case that companies trying to sell ███ for their product(s) have the strategy to use that offering as a means to displace other competitive products by citing the cost saving and operational benefits of a single vendor environment. Barnett's unique knowledge of the Aspect product architecture, advantages, shortcomings, roadmap, and total cost of ownership affords him the ability to define competitive displacement strategies that could only be defined with knowledge of trade secrets.

Moreover, If Barnett is permitted to assist Avaya with its ████████ he would be reasonably likely to use or disclose Aspect's confidential information, proprietary information or trade secrets. Barnett was intimately involved in all facets of planning Aspect's hosted and cloud strategies. There was nothing involving product direction, vision and product delivery that he was not acutely aware of. Under his direction, various elements of Aspect's unified IP product were enhanced for multi-tenancy capabilities (as required for hosting), and product capabilities and deployment plans were expanded to allow Aspect products to be deployed in virtualization environments, the basis for cloud / hosting. He directed Aspect in support the Microsoft and the Azure cloud platform and technologies while gaining a detailed knowledge of the Microsoft cloud offering by directing his architecture team to construct a series proof of concept demonstrations.

While Aspect takes Barnett's assertions that he will not intentionally rely on Aspect's trade secrets at face value, Aspect remains concerned that he may inadvertently utilize trade secrets, a concern validated by this Court in the Order. However, Aspect believes Barnett's most recent proposal is workable, and its concerns could be assuaged, so long as certain conditions attach to any amendment of the Order. Aspect requests that the Court implement the following safeguards to any amendment which will greatly reduce the risk that Barnett will utilize or disclose Aspect's trade secrets, inadvertently or otherwise:[1]

(1) That the Court's Order of May 27, 2011 in all respects remain in full force and effect except for the specific modifications made by the Court including, but not limited to prohibiting Mr. Barnett in performing these defined roles, from disclosing or using Aspect's confidential information, proprietary information or Trade Secrets as that term is defined in the Employment Agreement;

(2) That Mr. Barnett is prohibited from any discussion, meetings or from participating in any communications in which Aspect's business, products or competitive

---

[1] These safeguards are included in Aspect's Proposed Order attached hereto as <u>Exhibit A</u>.

environment is, in whole or part, the subject matter of such discussion, meeting or communication;

(3) That Mr. Barnett is not to have any communications, directly or indirectly, with any Aspect customer, supplier, licensee, licensor or business relation about doing business with Aspect or Avaya;

(4) That Mr. Barnett is prohibited from making any negative statements about Aspect, directly or indirectly, to any Aspect customer, supplier, licensee, licensor or business relation;

(5) That Mr. Barnett is prohibited from being involved in the application of the 7 proposed Avaya products with any of Avaya's call center products, technology, or functionality; and

(6) That Mr. Barnett provide to Aspect a monthly certification under oath of his compliance with the Order in all respects, including a description of the particular Avaya products that he has worked on during the past month.

Barnett has previously agreed to many of these conditions, directly or in spirit, either individually, through counsel, or his employer. See Affidavit of Gary E. Barnett in Support of Defendant's Motion to Alter or Amend the May 27 Order (Docket No. 22-1), ¶ 17; Affidavit of Gary Barnett in Opposition to Plaintiff's Motion for Preliminary Injunction (Docket No. 6-1), ¶¶ 33, 37, 38 and *Exhibit D*; Defendant's Memorandum of Law in Opposition to Motion for Preliminary Injunction (Docket No. 6), p. 7; and Affidavit of Alan Baratz in Opposition to Plaintiff's Motion for Preliminary Injunction (Docket No. 6-2), ¶¶ 7-15. Moreover, these restrictions will not prevent Barnett from dutifully performing his new responsibilities with Avaya, as has been confirmed by both himself and Mr. Baratz, Senior Vice President and President, Global Communications Solutions for Avaya. In light of Aspect's reasonable apprehensions regarding trade secret utilization, and Barnett's agreement to minimal restrictions aimed at preventing same, there is no reason why this Court should not adopt the additional safeguards proposed herein in the event it is inclined to modify the Order in the manner requested by Barnett.

## CONCLUSION

Aspect respectfully requests that this Court deny Barnett's Motion to Amend, except as specifically assented to by Aspect in this memorandum and in the proposed order attached hereto.

Respectfully Submitted,
Plaintiff,
ASPECT SOFTWARE, INC.,
By its attorneys,

/s/   Lawrence P. Murray
Lawrence P. Murray, BBO #561835
Michael V. Samarel, BBO #675682
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
617-345-3000

DATED: August 8, 2011

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASPECT SOFTWARE, INC., <br><br> Plaintiff, <br><br> v. <br><br> GARY E. BARNETT <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. 1:11CV10754 DJC |

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on August 8, 2011.

/s/ Lawrence P. Murray
*Attorney for Plaintiff*